Good morning, Your Honor. I'm Brendan Leary with the Federal Public Defender's Office in Northern District of West Virginia. I represent the appellant, Mr. Zachary Foster. I also represented Mr. Foster in the case below. We're here today, Your Honor, pursuant to a conditional guilty plea pursuant to Rule 11, wherein he preserved the issue on appeal to this Court, the District Court's denial of his motion to suppress. Mr. Foster was charged, Your Honor, with 922 G1 with being a prohibited person in possession of a firearm. And we're just asking this Court to reverse the District Court's finding that under Terry v. Ohio and its progeny that there was a reasonable and articulable suspicion that Mr. Foster was armed, was engaged in possible criminal activity. And therefore, the District Court granted the motion. We're asking this Court to reverse that because the issue presented really is very simple. And that is, under Terry, whether these two wheeling police officers had a reasonable and articulable suspicion that Mr. Foster was engaged in criminal activity and or armed and dangerous. Our view, Your Honor, is simply this, that the facts of this case, and this is a very fact-specific case because this Court has held in prior cases that these types of decisions are fact-specific. And the good news for this Court and our view is that the facts really are not in dispute here. I think that the testimony at the evidentiary hearing came in and it was pretty straightforward. And we're not quarreling with that. And I review under de novo standard with the District Court's legal conclusions below is whether under a totality of the circumstances, these two officers were justified under Terry that there was a reasonable suspicion that Mr. Foster was engaged in criminal activity. And we submit, Your Honor, that when this Court compares the facts of this case to the numerous cases this Court has seen. Sometimes it helps me. There's a lot of discussion over whether there was technically a seizure here or technically a stop. And what I want to know is what here in the sequence of events, what did the officers do wrong? How did they behave in a way that was well short of the Fourth Amendment standard of reasonableness? What action on their part was wrong? Well, I think that what the officers did was Officer Boyer test, excuse me, Officer Burke testified that he got out of his car, he saw Mr. Foster standing on the corner approximately three to four blocks away from a purported gunshot. And he had his duty rifle at the ready and approached him. Our submission... At the low read. Excuse me, Your Honor? At the low ready. It wasn't brandished at him or pointed. It was at the low ready. And it was a rifle. It wasn't his duty sidearm. It wasn't his handgun. It was a rifle. And he testified that he approached him. In our submission, Your Honor... All right, let's talk about that. Was there anything wrong with his approaching him? No, I don't think so. I think that the officer could have. It's the pat... Your Honor, we're arguing that the seizure occurred and the pat down was improper. Okay, so all right. I understand. All right. But I want to go through it step by step. Surely. We agree there wasn't anything wrong with him approaching Mr. Foster. I don't think so, Your Honor. But I think as he approached and as he got out of his car and was approaching, I don't think there's any doubt based on this record he was going to search him regardless of this purported hand movement that the district court relied on. I really want to keep the sequence straight. Sure. Nothing wrong with No. And Mr. Foster didn't respond. And this court has held that he's under no obligation to respond. And that doesn't rise to the level of... We're talking about whether the officers did something wrong. And I want to locate what it is you think they did wrong. And it wasn't wrong to get out of the car. It wasn't wrong to approach. It wasn't wrong to ask for questions. Then the search took place. It wasn't wrong for Foster to fail to respond to the question. A citizen has a perfect right not to respond. Okay. So what did the officers do wrong? I think that at that point, the pat down took place. And we're arguing that as to the reasonableness and the reasonable articulable suspicion at that stage as to Mr. Foster and what facts were present that the pat down is not justified. Okay. All right. So the real bone of contention here is the frisk. Yes, Your Honor. However, we have... Okay. So the timing of the frisk is interesting because you said nothing's in dispute. But I thought that the district court found that the frisk occurred only after Mr. Foster, the defendant, had reached into his pocket. And that was after the officers had asked if there was a weapon in his possession. I don't think that's in dispute, Your Honor. The hand movement, however, I don't think he actually got his hand into his pocket. He attempted to reach. And that's when Officer Burke ordered him to stop. And that's when the pat down took place. Well, they didn't use force or anything. No, Your Honor. They And we're talking about the wee hours of the morning. And you can tell from a cell phone general location they found him, you know, three or four blocks from where the cell phone 9-11 report had been made. And then it's early in the morning. All the stores are closed. The defendant seems to be the only one present. There's been a report that a gunshot has taken place. And the officers see a move after the inquiry is made whether there was a weapon. And he either reaches into his pocket or on his pocket or whatever. Now, then the officers respond. They don't raise their rifle, as I understand it. There's no indication of that. They don't. Nobody's tased. Nobody's, you know, they're not utilizing a whole lot of, there's no use of excessive force. Nobody's tased. Nobody's threatened with a rifle. They take what could be seen as a minimal protective step for their own a confrontation into which could escalate and either result in injury to Mr. Foster, which none of us wants, or injury to the officers. In other words, in certain circumstances, it's possible to actually see a frisk not as a hugely intrusive step, but as a preventive step to prevent a situation from escalating to the level that some of these tragic confrontations have where either the officers are wounded and shot or Mr. Foster is wounded and shot. And then there's understandably a lot of community reaction to that. And so one wonders whether in this case, it's one of those situations that Terry V. O'Hire envisioned, which is that you want to head off something worse and try to guarantee the safety of all involved to try to keep it from escalating. Your Honor, I would respond by saying that. Because if we deprive them of this. I think the district court, and I think that Judge Wilkinson, I think one of the things that was very important was this notion of officer safety. And I think if the court, and you touched on this just a second ago when you talked about the purpose of Terry. And if you go back and read Terry and what it talks about. And it talks about ferreting out crime, anticipating crime. And in that case, in the Terry case, there were two gentlemen that were armed and they were casing some type of commercial establishment and the officer was able to intercede before an armed robbery occurred. But Terry, and then the cases that this court has discussed, applying Terry, talks about anticipating crime. Not necessarily officer safety. And I think that the district court was missed. In my view, Your Honor, I think that this over-reliance on officer safety is misplaced. Because Terry talks about the reasonable suspicion as to this person and criminal activity. And if you look, and you touched on this, Your Honor, if you look at what Mr. Foster was doing, and you hit the facts. He was, it was just past midnight. He was approximately four blocks away. No, but if we both agree that they have the right to question him, and if during the course of questioning, no problem with remaining silent, but if they say, well, do you have a weapon? And I think, you know, and he starts reaching in. Then there's testimony, there was testimony before the district court, and this is where I do think the credibility of testimony before the district court could come in. The officer, we had no intention of frisking him until he reached into his, into the pocket after we had asked the question, do you have a weapon? I would respect, I understand, Your Honor, that's what the testimony said. Wasn't that what the district court credited? Yes, absolutely. Doesn't that matter? Well the district court talked at length about officer safety vis-a-vis the alleged hand movement. But, Your Honor, the... Delury, before you get, before you respond to that, I thought that you actually disputed the sequence of events here with respect to the stop. I thought in your brief you had indicated that at least one of these officers had already told your client that he was going to be detained. Officer Boyer testified, yes. And that the movement, the hand movement, did not occur until after that statement. I apologize, you're correct, Your Honor, because she... So what, I mean, so is your argument then that at that point he was seized and that's the reason why we have a violation in this case? Well I think it's twofold. I think it is the seizure. And Officer Boyer, she testified on direct. We patted him down because he was the only one in the area. That was it. And it's at the joint appendix at page 71. That's what she said. And she doesn't get into the time of the day. She doesn't get into the location of the 911 call. I see the problem with that is though that there was no focus on that testimony below and neither the magistrate judge nor the district court judge really resolved that conflict in the evidence. Well we raised it because we think the seizure occurred at that point. Well you raised it now, but I don't know that it was fully developed below. I think that it was one of the facts that she testified to, and I think under a de novo review this court can certainly take that into account. I think that what she said, in my view, is illuminating and very important, which was in her mind, excuse me, they came around the corner and there he was, and they were going to search him. So I'm arguing that the seizure occurred at that point. I mean why else would Officer Burke have had out his rifle? So I think that in these officers' minds it was search first, justify later. As the court is well aware under Terry, that's not the standard. It's justify first, search later. So that's why we're arguing it made that point, but when the court below, when the district court talked about the hand movement being significant, it referred to the Humphreys case from this court, and it talked about how this court had previously in Humphreys held that a hand gesture can rise to a reasonable suspicion, but if the court looks at the facts closely from Humphreys, they're dramatically different than what we have here. In Humphreys, the gentleman was standing with a large crowd of people in a high crime area. The officer got out of his vehicle, saw the hand check, and then smelled marijuana, asked the gentleman to stop. Mr. Humphreys walked down the street. The officer continued to walk after him, ordering him to stop two or three times. Mr. Humphreys refused. The officer continued to smell marijuana emanating from Mr. Humphreys' person. The officer actually had to walk into a residence that Mr. Humphreys had gone into, and I think the testimony... Well, I mean, the fact that that officer may have been a lot more patient in terms of waiting until making the necessary stop doesn't mean that these officers had to wait until your client did whatever he was going to do with the stuff, whatever he had in his pocket. Well, my only point, Your Honor, is that I think if you look at the facts of Humphreys, there's a lot more there in terms of the reasonable suspicion standard versus what we have here. I agree, but that's not the test, right? The test is how much do the officers need before they can actually make the stop. And we don't believe they had enough here. And we don't believe they had enough for the stop or they had enough for the pat down. I don't understand because there's so many of these. I mean, if you just put your common sense, it's not one thing in isolation that would give rise to reasonable suspicion. It's the totality. It's the totality of things. You get the 911 call. Is that enough to provide reasonable suspicion? No, not in my view. It's an anonymous call. And the district court agreed with you. Yeah, the 911 call, it can be a factor, but by itself, that can't provide reasonable suspicion. All right. By itself, it can't. There's the fact that it's very early in the morning. I mean, there are other cases where, you know, there have been lots of people, but this is very early in the morning. Is that fact by itself enough to provide reasonable suspicion for the police to stop anybody? No, it's not. It's not. But when you start combining it with others, then it becomes something more. Then, okay, it's a very high crime area. You make the point, well, it's not violence, it's drug distribution, but it's not violence. Is that in itself sufficient? No, under no circumstances. But the Supreme Court in Illinois v. Wardlaw says it's one of those facts that we what? There's the fact that all the stores around were closed. Is that reasonable suspicion? Not by itself, no. But in combination with what you and I have previously been discussing? Well, it begins to build. The fact that he's only three or four blocks from where the car placed the cell phone call, that begins to add a little bit more. The fact that all establishments are closed, that begins to add a little bit more. And so, you know, if I took a strategy of divide and conquer, I could go after each single piece of evidence and you and I would have a very high rate of agreement. But it's the combination, it's these five or six things that give me pause. Your Honor, you're engaging in the exact analysis that this court must engage in, and that's what the totality of the circumstances analysis requires. And we're simply saying that being close, or I would argue it's not close as compared to the Moore case that Your Honor authored many years ago, I think there's a big, and the district court relied on the Moore case. I think there's a big distinction between how close Mr. Foster was here to the purported shot versus how far Mr. Moore was to the burglary alarm. But the point is, Your Honor. But they had to investigate it, didn't you? Can't have calls from people saying there's a gunshot in this area. I'm not suggesting, of course they do. They had to investigate it. I agree, Your Honor, I agree. And we're not suggesting that. All we're saying is that when the court looks at the facts in this case, in our view, they were pretty innocuous, and they don't rise to the level of a reasonable, articulable suspicion as to Mr. Foster. And the magistrate judge agreed with us. And Your Honor, I'm out of time. I've reserved some time for rebuttal, unless the court has other questions. All right, thank you. All right, let's hear your side of it, Mr. Taft. Good morning, Your Honors. Tara Tai, appearing for the United States. May it please the court. I'd first like to address the discussion that you're having with counsel for Mr. Foster on the sequence of events and their contention that officers had already decided that they were going to search Mr. Foster as they approach. There's copious evidence in the record in this case that that is not, in fact, how the sequence of events unfolded. Even though the officer testified under oath that it was? There's one piece of testimony from the suppression hearing from Ms. Boyer that is taken out of context in Mr. Foster's brief. And when you consider the testimony from both officers as a whole. It says, did Officer Burke ask Mr. Foster any questions? At that point, we told Foster that we were going to detain. We were going to pat him down. Did you overhear Officer Burke ever ask if he had any weapons on him? Yes, we asked that at a later time. After we informed him the reason we were there, we're going to pat him down. First, she said, detain him. Right. And if you continue. What was she? If you continue. Is that a lie? It's not a it's not a lie, Your Honor. If you continue reading her testimony, counsel on direct examination takes her step by step through the chronology to clarify for the court at the suppression hearing how this transpired. And she specifically says. That they decided to frisk him that she received the order to. That is on pages 72 to 73 of the record. She discusses the the sequence and. Counsel asked, so at that point, Officer Burke ordered you to conduct the Terry Frisk. And this is after Mr. Foster reached towards his right front pocket. And she says yes in clarifying the sequence of events and the testimony from Mr. Burke. Officer Burke is the one who actually ordered the Terry Frisk, who made the decision that reasonable suspicion had risen to such a level that a frisk was necessary. And he testifies on cross-examination from counsel for Mr. Foster. They're discussing the timing of events and approaching Mr. Foster on the street. And counsel for Mr. Foster asks, and that's when you approached him. True. Officer Boyers, Officer Burke says that's correct. And at this stage, you had decided you were going to frisk him. And Officer Burke responds. No, my initial contact was with him was explaining the situation to him. What page is that on? That is on page 53 of the joint appendix is is. Whose incident report is on pages 20 through 22 of the joint appendix? Is that Boyer? Yes, your honor. OK, well, then her incident report is also consistent with her testimony that. She doesn't include what it says is. It appeared that Foster may be high on drugs. Officer Burke had his rifle in the low ready position. It appeared he may be high on drugs. Wait a minute. Officers did not smell odor of alcohol. Officers observed Foster start to put his right hand in his right pocket. Then then we then told him to get his hands out of his pockets. He did. And then we said we're going to detain him because a gunshot was in the area. She doesn't even talk about any question about a weapon. See, this is consistent with her testimony. There's no question about a weapon. It's just the pocket and we're going to detain you. Well, she does when she's questioned at the suppression hearing, both on direct from counsel for the government and on cross examination from counsel for Mr. Foster. She is consistent on the timing, and she does testify that there was questions about whether he had any weapons. And it was only was not at that point that officers decided that a pat down was necessary. It was after they advised him what they were investigating, asked him if he had any weapons and the combination of Mr. Foster reaching towards his pocket, which they relied on their training at the West Virginia State Police Academy that indicated to them when you're asking a person about weapons, a movement like that could be interpreted as a security check to make sure that a weapon is still in place. And this court has held that such a security check or hand motion can be considered as an element of reasonable. Then they asked him and he immediately complied when they said, you know, take your hand out of raise your hands up. He did comply. Yes, Your Honor. Immediately. Yes, Your Honor. But that does not lessen the level of reasonable suspicion because the reasonable suspicion is not in this case in particular is not just based upon the hand motion. It's a cumulative. It's a cumulative sequence of events, as Judge Wilkinson pointed out. They receive a 911 call that a gunshot has been fired in an area that's known for several different types of crime, including theft, vandalism, drug use. So they report to that. It's in the very early morning hours. Mr. Foster is the only one discovered in close proximity to that event. They approach as they're approaching him. He is not responding to their questions. He's not making eye contact with the officer, none of which the district court relied on. And he doesn't have to make I wouldn't. But an officer is approaching him in the night. He was ultimately was high on drugs. So officers are approaching him in the late at night guns at the low ready. Well, Your Honor, just to clarify, what is he? What could he have done at that point? If it's just that you're in this area, and I understand it's not just that, but could they have are you arguing that they could have seized or could have risked him just for being there in that area? Was he just in the wrong place at the wrong time? Certainly his presence in an area known for crime of and by itself is not reasonable suspicion. It's the accumulation of all of those events culminating in him reaching for his pocket. And I just want to do want to clarify one characterization of the district court's opinion. While they did strongly emphasize the officer safety aspect, they spent five pages of their opinion on that. I do just want to clarify that that's not the only thing they based their conclusion that there was reasonable suspicion on. The judge ends the opinion, saying that the facts as a whole of the case scale and tip the scale in favor of admitting the evidence. So they talk about what type of crime was being responded to, where it was, and all of the facts, the sequence of events as a whole. Yes, there was a particular emphasis, five pages of the opinion on officer safety, but that was not the only factor that led them to that conclusion. Ty, this issue of the Boyer's testimony, that was something that the district court, neither the magistrate judge nor the district court really focused on. Is that right? Correct, your honor. And as I pointed out, the totality of the record in this case, the incident reports that were filed and both officers testified that they wrote those incident reports the same day of the incident within hours of their interactions with Mr. Foster and their testimony at the suppression hearing. In fact, that wasn't the defense's theory for suppression. It was simply that even assuming all the facts and circumstances under our precedent, that it wasn't enough for these officers to initiate the frisk. Correct, your honor. The characterization that the officers had already decided upon approaching Mr. Foster that they were going to pat him down for weapons or detain him in any way, that was first raised on appeal in this case. But the district court didn't credit, I mean, the district court credited the testimony that the decision to frisk was made after he reached in the pocket. Correct, your honor. At page 137 of the appendix, the court is going through the facts of the sequence of events and they specifically talk about Mr. Foster making the security check, the motion towards his pocket. And then they say, at that point, Officer Burke instructed the defendant to place his hands out of his front pocket. Defendant complied with the commands. Subsequently, Officer Burke told Officer Boyer to frisk the defendant for weapons. You're reading the magistrate's report, R&R, or is that the district court? That's the district court's opinion in the case. The reason why I asked about the magistrate's report is that he made the same finding, right? And as to the timing. Yes. And that was never objected to by the defense. Correct, your honor. And it's important to note the standard of review specifically for that issue because that's a factual determination of what facts the sequence of events fell into. And in this case, the legal conclusion of whether there was reasonable suspicion is reviewed by this court de novo. But the factual conclusions in the district court's opinion are reviewed for clear error. No, Terry v. Ohio has two purposes, really. One is to allow police to take some preventive action and to try to head off things. And the other is to allow officers to have a tool such as a frisk to protect their safety and, again, to prevent escalation. But in an overall sense, Terry is really a preventive decision. It's prophylactic. A great part of it is to prevent worse things from happening, the worst things being the actual commission of an armed robbery or commission of a crime or a confrontation in which the victim is shot and wounded. So what Terry makes the calculation that frisks are not pleasant things and they shouldn't be randomly undertaken because they are an incursion on people's privacy and dignity. But Terry makes the judgment that sometimes if there's reasonable suspicion, the minor intrusion is warranted to prevent something far worse or even more tragic. And this seems in line with what was a very lopsided decision under the Warren court, probably one of the most famous decisions along with Miranda in all of criminal law, criminal procedure. And we have so many, over these past years, so many sad situations where people are shot, where officers are shot, where suspects are shot. It's terrible. And Terry may be one of those tools that we have to try to head off. If the tool is misused, it leads to anger all of its own. But if it's used in a measured and proper way, it can perform the function that Earl Warren himself envisioned for it. Absolutely, Your Honor. And there's some specific language in Terry that I think implies that this is exactly the type of case that that tool should be used for. The court in Terry said, when an officer is justified in believing the individual whose suspicious behavior he's investigating at close range is armed and presently dangerous to the officer or to others surrounding neighborhood, even the defendant himself, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. And that's exactly what the officers in this case were doing. When Mr. Foster reached towards his pocket, they had to rely on the culmination of their training, experience, and all the surrounding circumstances of their interaction with Mr. Foster to decide how best to proceed. And the district court took a look at those circumstances and conducted a well thought out and reasoned analysis and came to the conclusion that their actions were supported by reasonable suspicion in this case. Do you have something further that we have not touched on? There's no, there's no rule that says every advocate has to use every second of time. Absolutely, Your Honor. Just making sure that we've addressed all of the key points. I suspect you have. We may have reached the point of repetition. Yes, Your Honor. So based on the foregoing, we would ask that this court affirm the district court's decision denying Mr. Foster's request to suppress the evidence of those firearms. Thank you very much. Can you hold on for just one second? Sometimes my colleagues have questions. Absolutely. Judge, we have no questions. Thank you very much, Your Honors. Mr. Leary, we'd be happy to hear from you in rebuttal. Your Honor, keeping with the spirit of no repetition, I really would just comment on one matter and that would be the 911 call where the court a minute ago was talking about the magistrate judge's report and recommendation and what was objected to and what wasn't below. The magistrate judge's report and recommendation gave no credit to the 911 call and the government didn't object to that finding, so the district court never addressed it. I don't think it's been preserved here, so I would argue, therefore, that the 911 call is immaterial. I think that Judge Thacker's questions to my colleague goes to the heart of the matter with regard to Officer Boyer and her belief that he was in the area, we were going to search, obviously. I think actions sometimes speak louder than words. When he exited the vehicle, he had his gun, not necessarily drawn. I would argue at the ready as drawn, but I think we're splitting hairs at this point. Clearly, in my view, those actions reveal they were going to search him. Other than that, Your Honor, I think the court is well equipped to deal with this and I think everything else has been addressed in the record over here today at the oral argument. I'd be happy to answer any questions if the court has anything else. Thank you, Your Honor. We thank you. We appreciated both of your arguments. We'd like to adjourn court and come down and say hi to you. This honorable court stands adjourned, signing die. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Albert Diaz, Stephanie D. Thacker